No. 24−7295

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

PRESTON LEE,

Plaintiff-Appellant

v.

L3HARRIS TECHNOLOGIES, INC.

Defendant-Appellee

---

On Appeal from the United States District Court
District of Hawaii Civil No. 1:20-00489 (LEK/KJM)
(Honorable Leslie E. Kobayashi)

---

**OPENING BRIEF**

---

FUJIWARA AND ROSENBAUM, LLLC

JOSEPH T. ROSENBAUM          9205
ELIZABETH JUBIN FUJIWARA     3558
Alakea Corporate Tower
1100 Alakea St. 20th Fl. Ste. B
Honolulu, Hawaii 96813
Telephone: (808) 203-5436

Attorney for Plaintiff-Appellant
PRESTON LEE

## **<u>TABLE OF CONTENTS</u>**

<u>Page</u>

TABLE OF AUTHORITIES.................................................................iii

STATEMENT OF JURISDICTION.......................................................1

STATEMENT OF ISSUES...................................................................2

STATEMENT OF THE CASE..............................................................2

STATEMENT OF FACTS....................................................................3

SUMMARY OF THE ARGUMENT....................................................16

STANDARD OF REVIEW.................................................................17

ARGUMENT.....................................................................................19

CONCLUSION..................................................................................24

STATEMENT OF RELATED CASES.................................................25

CERTIFICATE OF SERVICE……………………………………..………26

# <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                              <u>Page</u>

*Anthony v. Trax Int'l Corp.*,
955 F.3d 1123, 1132 (9th Cir. 2020) ……………………………..……..19

*Bates v. United Parcel Serv., Inc.*,
511 F.3d 974, 989 (9th Cir. 2007) (en banc)…………………………….20

*Celotex Corp. v. Catrett*,
477 U.S. 317, 322, 106 S.Ct 2548, 91 L.Ed.2d 265 (1986)……………...17

*Cleveland v. Policy Mgmt. Sys. Corp.*,
526 U.S. 795, 806–07, 119 S. Ct. 1597, 143 L. Ed. 2d 966 (1999)…………20

*David v. Betts*,
CIV. NO. 20-00002 JMS-WRP, 2024 WL 2214613, at *17 n.24
(D. Hawai`i May 15, 2024……………………………………………..22

*Humphrey v. Mem'l Hosps. Ass'n*,
239 F.3d 1128, 1139—40 (9th Cir. 2001)……………………..……………19

*Lam v. University of Hawaii*,
40 F.3d 1551 (9th Cir.1994)…………………………………………..18, 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)……………...17

*Nelson v. City of Davis*,
571 F.3d 924, 928 (9th Cir. 2009)…………………….………………..21

*Summers v. A. Teichert & Son, Inc.*,
127 F.3d 1150, 1152 (9th Cir. 1997)……………………………………17

*Van Asdale v. Int'l Game Tech.*,
577 F.3d 989, 999 (9th Cir.2009)………………………………………22

*Yartzoff v. Thomas*,
809 F.2d 1371, 1377 (9th Cir. 1987)………………………………..18

*Yeager v. Bowlin*,
693 F.3d 1076, 1080 (9th Cir. 2012)……………………………...…..20, 21

**TABLE OF AUTHORITIES**  (continued)

STATUTES                                                                                          Page

28 U.S.C. §§ 1331...................................................................... 1

42 U.S.C. § 12111(8)………………………………………..………19

29 C.F.R. § 1630.2(m)………………………………………………19

29 C.F.R. § 1630.2(n)(1)……………………………………………20

## STATEMENT OF JURISDICTION

Plaintiff/Appellant Preston Lee ("Mr. Lee") filed a civil rights action against Defendant the L3Harris Technologies, Inc. ("L3") for his wrongful termination from employment in violation of, *inter alia*, the Americans with Disabilities Act (as amended) and related disability claims under the State of Hawai'i's Hawai'i Revised Statutes Chapter 378 and the Hawai'i Whistleblowers Protection Act. [Docket No. 50-6] The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331.

L3 filed its first Motion for Summary Judgment as to all of Mr. Lee's claims. [Docket Nos. 49]. Via its Order, the District Court granted L3's Motion for Summary Judgment on January 31, 2022 [Docket No. 82] and filed its Judgment on the same date. [Docket No. 83 ]. Mr. Lee filed a timely Notice of Appeal on February 25, 2022. The granting of L3's First Motion for Summary Judgment was reversed, in part, by this Court on appeal in Case Number No. 22-15288 via this Court's Memorandum Opinion of August 18, 2023. [Docket No. 90]. See as to this procedural timeline. [Docket No. 208, 1-ER-004-005].

Upon remand to the trial court, L3 filed a Second Motion for Summary Judgment as to all of Mr. Lee's remaining claims (his remaining disability discrimination claims under federal and Hawai'i state law). [Docket No. 189 and 190, 2-ER-123-158].

Via its Order ("Order"), the District Court granted L3's Second Motion for Summary Judgment on October 31, 2024 [Docket No. 208, 1-ER-003-021] and then filed its Judgment on November 15, 2024. [Docket No. 210, 1-ER-002] Mr. Lee filed a timely Notice of Appeal on November 29, 2024. [Docket No. 211, 3-ER-422-424]

This Court has jurisdiction to review the grant of summary judgment under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

Did the District Court err in granting Summary Judgment on Mr. Lee's remaining claims?

## STATEMENT OF THE CASE

On February 11, 2021, Mr. Lee filed his First Amended Complaint against L3 alleging violations of his civil rights and seeking damages against L3 for Mr. Lee's wrongful termination from employment after over twenty-five years of dedicated service. [Docket No. 50-6].

Specifically, Mr. Lee brought the following claims against L3 for his wrongful termination:

Claim 1: Disability Discrimination under the Americans with Disabilities Act.
Claim 2: Retaliation under the Americans with Disabilities Act.
Claim 3: Disability Discrimination under the Hawai'i Revised Statutes § 378-2.
Claim 4: Retaliation under the Hawai'i Revised Statutes § 378-2(2).

2

Claim 5: Violation of Hawai'i Revised Statutes Chapter 378 Part V
Whistleblowers' Protection Act.
[Docket No. 50-6].

On June 28, 2024, L3 filed its Second Motion for Summary Judgment and associated documents as to all of Mr. Lee's remaining claims. [Docket No. 189 through 190-10 and 190-11, 2-ER-123-316], [Docket No. 190-11-21, 3-ER-291-318-421]. Mr. Lee filed his Memorandum in Opposition and related documents on August 8, 2024. [Docket No. 194 through 198-1, 2-ER-046-122]. L3 filed its Reply and related documents on August 15, 2024. [Docket No. 199, 66, 2-ER-023-045]. L3 Second Motion for Summary Judgment came on for hearing before the District Court on September 24, 2024 [Docket No. 208, 1-ER-003]. On October 31, 2024, the District Court issued its written Order Granting Defendant's Motion for Summary Judgment. [Docket No. 208, 1-ER-003-021]

On November 29, 2024, Mr. Lee filed his timely Notice of Appeal to this Court of the District Court's grant of L3's Second Motion for Summary Judgment. [Docket No. 210, 3-ER-422-425]

## STATEMENT OF FACTS

In his Memorandum in Opposition to L3's Second Motion for Summary Judgment filed on August 8, 2024 [Docket No. 194, 2-ER-101-122], Mr. Lee provided, *inter alia*, the following facts:

Mr. Lee is a fifty-seven (57) year old a combat veteran who served our

country in the United States Navy from 1982-1992. *See* Declaration of Preston Lee ("Lee Decl.") [Docket No. 195-6, 2-ER-076-100] at ¶ 4 attached to Mr. Lee's Concise Statement of Facts ("CSF"). [Docket No. 195, 2-ER-046-048] Mr. Lee served two tours in the Persian Gulf in the late 1980's/early 1990's and has PTSD as a result since 1991. [Docket No. 195-6, 2-ER-077-078] at ¶¶ 5-11. Mr. Lee never knew what PTSD was until he was informed of what it is by his doctor in or about 2016-2017 when he spoke about his PTSD symptoms with his VA doctor. [Docket No. 195-6, 2-ER-078] at ¶ 12.] Mr. Lee was formally diagnosed with PTSD by at least one of his doctor in or about 2017 or 2018. *Id.* at ¶ 13.

Mr. Lee was hired on or about March 20, 1994 to work on the Flight Line at the time ITT Industries ("ITT") was the main contractor for the United States Navy at Barking Sands on Kaua'i. *Id.* at ¶ 14. Mr. Lee worked on the Flight Line as a helicopter inspector. *Id.* at ¶ 15. Mr. Lee was promoted during the time he worked for ITT. *Id.* at ¶ 16. Mr. Lee had PTSD the whole time he worked at Barking Sands on the Flight Line for ITT and he never once got into any physical altercations in the workplace and never made any threats against anyone in the workplace. *Id.* at ¶ 17. He never had any performance issues related to his ability to perform his job duties. *Id.* at ¶ 18. In November 2006, Mr. Lee became a painter. *Id.* at ¶ 19.

L3 Harris Technologies, Inc. ("L3") took over the United States Navy contract Mr. Lee worked under from ITT at Barking Sands in or about 2015. *Id.* at

4

¶ 20. Mr. Lee held the position of painter. [Docket No. 195-6, 2-ER-079] at ¶ 21.] The entire time he worked for L3 Mr. Lee had PTSD, he just hadn't been officially diagnosed yet. *Id.* at ¶ 22.

Mr. Lee submitted documentation to the VA in 2017 and 2018 requesting disability benefits related to his PTSD diagnosis that occurred around the same time. Part of the documentation to the VA reflected Mr. Lee's private thoughts and feelings related to his PTSD that he conveyed to his physicians. L3 did not have any of this documentation prior to Mr. Lee's termination. *Id.* at ¶ 23.

In February 2019, Mr. Lee received 100% VA disability benefits due to his PTSD. *Id.* at ¶ 24. At the time the VA approved his 100% disability benefits, the VA knew he was employed at L3 and there is nothing that forbids a military veteran from receiving 100% VA benefits for PTSD and/or other injuries to continue to work in the private sector. *Id.* at ¶ 25. L3 became aware of Mr. Lee's PTSD disability via L3 Lead Sean Igne in or about February 2019 after Mr. Lee informed Mr. Igne Mr. Lee received 100% VA benefits based on his PTSD. [Docket No. 195-6, 2-ER-080 at ¶ 26.] Mr. Lee worked on a day-to-day basis side-by-side alongside Mr. Igne, Gilbert Castro and David Hesapene at the paint shop for L3. *Id.* at ¶ 27. Mr. Lee did not work with L3 employee Mark Vegas on a day-to-day basis as he was not in the paint shop. He was a rigger not a painter. *Id.* at ¶ 28.

5

Since disclosing his PTSD in the workplace, Mr. Lee was harassed and unfairly disciplined. *Id.* at ¶ 29. Sean Igne told L3's human resources that he was afraid to work with Mr. Lee because of Mr. Lee's PTSD. *Id.* at ¶ 30. In or about February 2019, Mr. Igne asked Mr. Lee why he didn't just retire because he got his 100% VA benefits for PTSD. *Id.* at ¶ 31. Mr. Lee told Mr. Igne it was none of his business. *Id.* at ¶ 32.

Mr. Igne wrote a letter to L3 to falsely portray Mr. Lee in a negative light as a violent person in the workplace that was a threat to him and Mr. Lee's coworkers. Mr. Igne knew this was false. Mr. Igne has been proven to be a liar and a thief of government gas and has falsified his timecards at work. He is simply a liar and a cheat. [Docket No. 195-6, 2-ER-081 at ¶ 35].

Mr. Lee had PTSD since 1991 and worked at Barking Sands since 1994 and for L3 since 2015 and Mr. Lee never did anything violent in the workplace and he never threatened or physically harmed anyone. *Id.* at ¶ 36]. Although PTSD does result in irritability and other negative emotions, part of having this disability is Mr. Lee learning to deal with it and maintain his mental wellbeing through learning coping mechanisms and to not let situations enflame his PTSD. *Id.* at ¶ 37. Through his efforts to keep his PTSD in check, Mr. Lee has always kept it together at work and he has never been violent with anyone at the workplace and he would never. He told L3 the same. *Id.* at ¶ 38. Mr. Lee conveyed this to L3's human

resources', Julie Broyles, when they asked him about it. Mr. Lee confirmed that he did not want to hurt his coworkers or in any way be violent in the workplace. *Id.* at ¶ 39. Mr. Lee has never once been in a physical altercation in the workplace and he has never physically threatened anyone in the workplace. [[Docket No. 195-6, 2-ER-082 at ¶ 40].

Working at Barking Sands is and has always been a workplace for blue collar workers and many veterans. It is quite common for the employees to be cursing in the workplace and at each other. *Id.* at ¶ 41 Every day that he worked at L3 Mr. Lee's coworkers were cursing in the workplace. Lee Decl. Id. at ¶ 42. Mr. Lee's former manager/supervisor Rod Martin himself would curse in the workplace. Mr. Lee personally heard Mr. Martin curse more than five (5) times. *Id.* at ¶ 43. Mr. Igne himself would also curse in the workplace. Mr. Lee has heard Mr. Igne curse at least twice a day when he worked with Mr. Igne. Mr. Lee worked with Mr. Igne for fourteen (14) years. *Id.* at ¶ 44. Rod Martin likely heard Mr. Igne curse in the workplace as it was so common. *Id.* at ¶ 45. Mr. Lee tried to remain professional in the workplace. *Id.* at ¶ 46. Mr. Lee's professional conduct is reflected in that he never had a poor performance review and, in 2019, he received from L3 an award for 25 years of dedicated service. *Id.* at ¶ 47. Mr. Lee worked at Barking Sands for 26 years and never was he violent. he might have been loud and

might have cursed, but this was commonplace in this blue collar and veteran-filled workplace. [Docket No. 195-6, 2-ER-083 at ¶ 49].

In or about March 2019, Mr. Lee was told by his supervisor, Rodney Martin, to go to the human resources ("HR") at 9:00 a.m. *Id.* at ¶ 50. Mr. Lee did as instructed and met with Julie Broyles head of L3 HR in Hawai'i and Jasmine Apo an L3 HR representative. *Id.* at ¶ 51. At the meeting, Ms. Broyles confirmed she was aware of Mr. Lee's PTSD. *Id.* at ¶ 52. Ms. Boynes began to ask Mr. Lee a series of questions listed below related to his PTSD as Ms. Apo took notes. *Id.* at ¶ 53.

Ms. Broyles stated because of Mr. Lee's PTSD they had to ask him some questions. *Id.* at ¶ 54. Ms. Broyles asked, amongst other questions: Do you want to hurt your coworkers? Mr. Lee answered, "No." Do you want to hurt yourself? Mr. Lee answered, "No." Do you want to kill your coworkers? Mr. Lee answered "No." Do you want to kill yourself? Mr. Lee answered, "No." Do you have an anger problem? Mr. Lee answered, "No." Do you want to kill people when you get angry? Mr. Lee answered, "No." Do you need anger management classes? Mr. Lee answered, "No." Do you need a psychiatrist? Mr. Lee answered, "No." Do you have a drug problem? Mr. Lee answered, "No." Do you have an alcohol problem? Mr. Lee answered, "No." [Docket No. 195-6, 2-ER-084 at ¶ 57]. Mr. Lee asked them if they were trying to fire him and Ms. Broyles and Ms. Apo said they were

8

there to help him. *Id.* at ¶ 58. Ms. Broyles asked Mr. Lee if he needed any accommodation. *Id.* at ¶ 59. Mr. Lee responded, "No" as he had been functioning in the workplace up to that point for twenty-five (25) years without accommodation and without any violence or any other threatening conduct. *Id.* at ¶ 60. Mr. Lee had been able to perform his job duties as a painter for years without anyone calling his ability to do his job functions into question. Mr. Lee saw no reason for an accommodation. Nothing had changed. *Id.* at ¶ 61.

After he was called in and interviewed by HR, Mr. Lee spoke with L3's Bill Nordmeier, the operator for grounds department, who informed Mr. Lee that Mr. Nordmeier also had just received 100% VA disability for his back. [Docket No. 195-6, 2-ER-085 at ¶ 64.] Mr. Nordmeier was still working at L3s although he has 100% VA disability. *Id.* at ¶ 65. Due to the way Mr. Lee was questioned by HR after getting his 100% disability from the federal government, Mr. Nordmeier told Mr. Lee he went to L3 HR to inform them that he also got his 100% VA disability. *Id.* at ¶ 66. Mr. Nordmeier told Mr. Lee he went to L3 HR and disclosed that he had received 100% disability from the federal government and wanted to disclose it to L3. *Id.* at ¶ 67. Mr. Nordmeier told Mr. Lee that HR at L3 told Mr. Nordmeier that he doesn't need to disclose it and that he shouldn't talk about his disability at work as it was personal. *Id.* at ¶ 68.

On or about November 15, 2019, Mr. Lee's coworker Gilbert Castro was verbally warned by the safety lady at Barking Sands for not wearing protective gear. [Docket No. 195-6, 2-ER-085-086 at ¶70.] After lunch on the same date, Mr. Igne yelled at Mr. Lee to put on pants which he immediately complied with. [Docket No. 195-6, 2-ER-086 at ¶ 71]. Mr. Lee was power washing at that time and was wearing shorts because he was soaking wet. *Id.* at ¶ 72. Mr. Lee was wearing steel toed rubber boots. *Id.* at ¶ 73. At that time, Mr. Igne was also wearing shorts and tennis shoes. *Id.* at ¶74. Mr. Igne wore shorts and tennis shoes every day at work. *Id.* at ¶ 75. On the same date, Mr. Lee told Mr. Igne, "Tomorrow if I have to wear long pants, you have to wear long pants. If I have to wear steel toe shoes you have to wear steel toe shoes. What is good for one is good for all. So come tomorrow morning have your PPE or else." *Id.* at ¶ 78. Mr. Igne said, "Or else what, you going turn me in?" [Docket No. 195-6, 2-ER-086-087 at ¶ 79]. Mr. Lee respond, "Yeah"?" [Docket No. 195-6, 2-ER-087 at ¶ 80]. Mr. Igne: "Well, fuck you" *Id.* at ¶81. Mr. Lee responds: "Well, fuck you too." *Id.* at ¶ 82. Mr. Igne and Mr. Lee exchanged a couple more "fuck yous" and Mr. Lee realized it was wrong and walked away. *Id.* at ¶ 83. Mr. Lee never physically threatened Mr. Igne. *Id.* at ¶ 84. Mr. Igne claims that when they spoke Mr. Lee's hands were "fisted and his chest was popped out." This is completely false. Mr. Lee was in no way physically threatening Mr. Igne. *Id.* at ¶ 85.

The following workday, Mr. Lee was called into Mr. Martin's office regarding a letter/note that Mr. Igne wrote to human resources/management regarding the previous day's confrontation with Mr. Lee. *Id*. at ¶ 86. Mr. Martin asked Mr. Lee a series of questioned that indicated Mr. Igne had given Mr. Martin false information. [Docket No. 195-6, 2-ER-087-088 at ¶¶ 87-95]. Mr. Martin said he was going to investigate Mr. Lee and this alleged incident. [Docket No. 195-6, 2-ER-088 at ¶ 97].

Previously in or about October 2017, Mr. Igne lied to Mr. Martin and stated Mr. Lee walked up to Mr. Igne with clenched fists acted like he was going to attack Mr. Igne and falsely alleged Mr. Lee said he was going to kick Mr. Igne's ass after work. *Id*. at ¶ 98. This was proven to be a lie by the two witnesses present. *Id*. at ¶ 99. In his November 2019 letter to L3 regarding him being afraid of Mr. Lee, Mr. Igne cites to the incident on October 24, 2017. The truth of that incident is that Mr. Igne falsely claimed that Mr. Lee had again clenched his fists and popped out his chest like he wanted to fight. [Docket No. 195-6, 2-ER-088-089 at ¶ 100]. This incident was investigated by L3 and David Hesapene, who was a direct witness told the truth. David Hesapene reported that Mr. Lee never had clenched fist and a popped-out chest and never said he wanted to fight Mr. Igne. Mr. Igne was again lying. The investigation, done by Rodney Martin, came back that Mr. Lee did nothing wrong. Lee Decl. [Docket No. 195-6, 2-ER-088 at ¶ 100].

11

On November 18, 2019, Mr. Lee had a meeting with human recourses and Mr. Martin regarding the confrontation with Mr. Igne. [Docket No. 195-6, 2-ER-089 at ¶ 102]. Mr. Lee was told he was being written up for breaking the code of conduct for telling Mr. Igne fuck you. *Id*. at ¶ 103. During this meeting, Mr. Lee reported that Mr. Igne had been stealing gas from the government for his personal truck. The theft of the gasoline was confirmed by Gilbert Castro. Mr. Lee then said he had to immediately take stress leave and that he could not work under these conditions as he felt he was being single out now that he was officially diagnosed with PTSD and those at the workplace knew about his diagnosis. [Docket No. 195-6, 2-ER-090 at ¶ 111].

Mr. Lee went to see his doctor that very day to be placed on stress leave which was effective November 21, 2019. *Id*. at ¶¶112-113.

On December 5, 2019, Ross West, the L3 project manager called Mr. Lee and requested Mr. Lee's CAC card and secret clearance card. The CAC and secret clearance cards are national security sensitive. Mr. Lee received security clearance training every year. L3 employees are supposed to give the CAC card and secret clearance card to security not to Mr. West. *Id*. at ¶ 114. Mr. Lee was directed by Mr. West to give his CAC card and secret clearance card to Mr. West and if he wasn't there then give it to his secretary. *Id*. at ¶ 115. Mr. Lee objected and said that was not proper as the CAC card and the secret clearance card were national

12

security related items that need to be secure at all times. *Id.* at ¶ 116. Following Mr. West's directive, Mr. Lee brought the CAC card and secret clearance card on December 6, 2020 to Mr. West's office, Mr. West was not there so the card was left with Mr. West's secretary. [Docket No. 195-6, 2-ER-091 at ¶¶ 118-119]. This was a clear national security violation as Mr. Lee should have been directed to provide the CAC card and secret clearance card to the L3 security to safeguard those security sensitive items. *Id.* at ¶ 120. There were other L3 employees including Melissa Castillo and William "Bill" Milke, who were on stress leave that did not have their CAC cards and clearance cards removed by L3. They did not have PTSD. *Id.* at ¶ 121.

On or about April 1, 2020, Mr. Lee's doctor, Dr. Williamson, released him to return to work. *Id.* at ¶ 122. Mr. Lee was told to stay home and he would be paid his full wages. *Id.* at ¶ 123. Mr. Lee was never notified by L3 that they felt he was a threat to return to the workplace or was he given a chance to provide his side of the story. Mr. Lee was never called by L3 to determine if he was a threat to return to the workplace. Mr. Lee was never interviewed, his psychologists/psychiatrist were not interviewed, he had no chance to refute any of L3's feelings that he was a threat to return to the workplace. L3 never did any investigation into whether Mr. Lee was a threat to the workplace in 2020 that included Mr. Lee or any doctor's or family on his behalf that would verify he was not a threat to the workplace. Mr.

Lee's twenty-six (26) years working at Barking Sands, while he had PTSD, with no violence in the workplace is evidence that he was not a threat to the workplace or his coworkers. [Docket No. 195-6, 2-ER-091-092 at ¶ 124].

On June 22, 2020, Mr. Lee was issued his termination letter that does not indicate why he was terminated, and he was never told why he was terminated. [Docket No. 195-6, 2-ER-092 at ¶ 125].

As a result of his termination and his emotional fallout related thereto, Mr. Lee's condition of PTSD became such that he could not work, think clearly, interact with others, be around people, sleep or eat as he normally could prior to the wrongful termination. [Docket No. 195-6, 2-ER-097 at ¶ 149].

After his termination, Mr. Lee contacted the Social Security ("SS") office on June 25, 2020 to file for Social Security Disability Benefits (SSD) as the exacerbation of his PTSD caused by his termination and his negative thoughts, anxiety and worry regarding the same caused him to be no longer be able to work, think clearly, interact with others, be around people, sleep or eat. [Docket No. 195-6, 2-ER-097-098 at ¶ 150]. Several of the documents that were produced as a result of Defendant L3Harris's subpoena to the SS office reflect that Mr. Lee initially filed on June 25, 2020. [Docket No. 195-6, 2-ER-098 at ¶ 151].

Up until his termination, Mr. Lee was ready and willing to return to work as he previously had been working and completing all of the essential job duties.

14

[Docket No. 195-6, 2-ER-098 at ¶ 152]. After being wrongfully terminated, Mr. Lee was essentially losing his mind. He just wanted to be alone and rarely left my house. [Docket No. 195-6, 2-ER-098 at ¶ 153]. He fell into a deep depression. [Docket No. 195-6, 2-ER-098 at ¶ 154]. Mr. Lee never contacted or filed anything regarding SSD until he was terminated. He did not file anything with the SS office on June 17, 2020. [Docket No. 195-6, 2-ER-098 at ¶ 155]. No one assisted Mr. Lee with filing his initial SSD filing on June 25, 2020. [Docket No. 195-6, 2-ER-098 at ¶ 156]. In his June 25, 2020, SSD filing Mr. Lee submitted everything to the best of my knowledge and ability. [Docket No. 195-6, 2-ER-098 at ¶ 157]. Mr. Lee's first SSD application was denied likely because he didn't know how to fill out the form or provide the necessary information and documentation. [Docket No. 195-6, 2-ER-098 at ¶ 158]. When Mr. Lee tried to fill out and file his initial SSD application, he probably filled it out wrong as he gets confused and has headaches when he fills out these types of forms. [Docket No. 195-6, 2-ER-099 at ¶ 159]. As is a well-known symptom of PTSD, Mr. Lee's PTSD causes him to have issues with his short-term memory. [Docket No. 195-6, 2-ER-099 at ¶ 160].

In his June 25, 2020 SSD filing, Mr., Lee put the date of disability as November 18, 2019 as that was the last day he actually worked before being terminated. This is what he understood the question to mean at the time. [Docket No. 195-6, 2-ER-099 at ¶ 161].

15

Mr. Lee never contacted the Social Security office to apply for disability benefits before he was terminated as he thought he would be returned to the workplace after taking my stress leave. [Docket No. 195-6, 2-ER-099 at ¶ 162]. Mr. Lee never thought about contacting the Social Security office until he was terminated, and his PTSD symptoms got much worse to the point he could no longer work. [Docket No. 195-6, 2-ER-099 at ¶ 163]. Mr. Lee was ready and willing to return to work as he informed his employer via my doctor, Dr. Williamson. [Docket No. 195-6, 2-ER-099 at ¶ 164].

Mr. Lee filed a second request for SSD benefits on or about October 6, 2021 after his first application was denied. The date Mr. Lee put for the start of his disability in this second SSD application was June 23, 2020, the day after his termination when his PTSD condition got much worse. [Docket No. 195-6, 2-ER-099 at ¶ 165]. Mr. Lee was finally granted his SSD benefits in 2023. [Docket No. 195-6, 2-ER-100 at ¶ 166]. Mr. Lee has not worked a day since being terminated as he is unable to function at a level that he could be employed. [Docket No. 195-6, 2-ER-100 at ¶ 168].

## SUMMARY OF THE ARGUMENT

The District Court's grant of summary judgment should be reversed as Mr. Lee proffered sufficient facts to create a genuine issue of material fact as to whether he was a qualified employee with a disability via his declaration and

documents attached to his Opposition to L3 Second Motion for Summary Judgment. The District Court erred when it found that Mr. Lee's declaration attached to his Opposition to L3 Second Motion for Summary Judgment was a "sham affidavit". The District Court took several facts in the light most favorable to L3, in violation of the applicable summary judgment standard, and/or ignored salient facts proffered by Mr. Lee that show his declaration was not a sham affidavit. But for the exclusion of Mr. Lee's declaration as a sham affidavit, he would have clearly passed summary judgment. Mr. Lee has proffered sufficient and reliable evidence that a reasonable trier of fact could determine that the L3 did terminate Mr. Lee due to, *inter alia*, his disability (Post-Traumatic Stress Disorder).

## STANDARD OF REVIEW

This Court reviews *de novo* a grant of summary judgment. *Summers v. A. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).

"[S]ummary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct 2548, 91 L.Ed.2d 265 (1986). If the moving party meets its initial burden, the burden shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. *Matsushita Elec. Indus.*

17

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A fact is material if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S.Ct. 2505, 91 L. 202 (1986). A genuine issue of material fact arises when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 248-49. "[T]he opposing party need not establish a material issue of fact conclusively in its favor." *Sanders*, *supra*. "It is sufficient that the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* (quotation and citation omitted).

The Ninth Circuit Court of Appeals is generally reluctant to approve summary judgment in a case in which the motivation or intent of a party is placed at issue, especially in employment rights cases. *See, e.g., Perez v. Curcio,* 841 F.2d 255, 258 (9th Cir. 1988)(emphasis added); *Yartzoff v. Thomas,* 809 F.2d 1371, 1377 (9th Cir. 1987). Consequently, as the requisite discriminatory intent is inherently a factual question, and is usually proven by inference and circumstantial evidence, it is rare to grant summary judgment in favor of a defendant in a discrimination case. *See Lam v. University of Hawaii*, 40 F.3d 1551 (9th Cir.1994) (emphasis added). In employment discrimination cases brought under the *McDonnell Douglas* framework, "[w]e require very little evidence to survive summary judgment precisely because the ultimate question is one that can only be

18

resolved through a searching inquiry -- one that is most appropriately conducted by the factfinder, upon a full record." *Lam v. University of Hawaii*, 40 F.3d 1551, 1564 (9th Cir. 1994).

## ARGUMENT

### THE DISTRICT COURT ERRED IN GRANTING L3's MOTION FOR SUMMARY JUDGMENT AS MR. LEE'S DECLARATION WAS NOT A "SHAM AFFIDAVIT"

The District Court erred in finding that Mr. Lee's declaration attached to his Opposition to L3 Second Motion for Summary Judgment was "sham affidavit" and therefore he had not submitted sufficient facts that he was a qualified employee with a disability under the federal and state disability discrimination laws. [Docket No. 208, 1-ER-003-021]. It must be noted that the Sham Affidavit issue was first brought up in L3's Reply and Mr. Lee had no chance to brief the issue.

As is clear from the District Court's Order, "At issue is the second element, whether Lee was a "qualified individual" at the time of his termination. Cf. Anthony v. Trax Int'l Corp., 955 F.3d 1123, 1132 (9th Cir. 2020) (indicating that the plaintiff must show he was qualified for the position at the time of the alleged discrimination). A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); see also 29 C.F.R. § 1630.2(m). Essential functions are "the

19

fundamental job duties of the employment position . . . . not includ[ing] the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1).

> "If a disabled person cannot perform a job's 'essential functions' (even with a reasonable accommodation), then the ADA's employment protections do not apply." Cripe [v. City of San Jose], 261 F.3d [877,] 884–85 [(9th Cir. 2001)].
> "If, on the other hand, a person can perform a job's essential functions, and therefore is a qualified individual, then the ADA prohibits discrimination" with respect to the employment actions outlined in 42 U.S.C. § 12112(a). Id.

Bates v. United Parcel Serv., Inc., 511 F.3d 974, 989 (9th Cir. 2007) (en banc)."

[Docket No. 208, 1-ER-013].

As to the Sham Affidavit rule, the District Court's Order provided, "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." Yeager v. Bowlin, 693 F.3d 1076, 1080 (9th Cir. 2012) (citation and quotation marks omitted). The "sham affidavit rule prevents a party who has been examined at length on deposition from raising an issue of fact simply by submitting an affidavit contradicting his own prior testimony, which would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." Id. (brackets, citations, and internal quotation marks omitted). "[N]ew facts, accompanied by a reasonable explanation, should not ordinarily lead to the striking of a declaration as a sham." Id. at 1081 (citing Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806–07, 119 S. Ct. 1597, 143 L. Ed. 2d 966

(1999)). The sham affidavit rule does not prevent the non-moving party from elaborating upon or clarifying prior testimony. See Nelson v. City of Davis, 571 F.3d 924, 928 (9th Cir. 2009)." [Docket No. 208, 1-ER-015-16].

"This rule "should be applied with caution because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment." Yeager, 693 F.3d at 1080 (citation omitted). To trigger the rule, the "district court must make a factual determination that the contradiction is a sham, and the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." Id. (citation and internal quotation marks omitted). This may occur when a declaration contains facts that the affiant previously testified he could not remember, unaccompanied by a reasonable explanation for the refreshed recollection. Id. at 1080-81. The sham affidavit rule does not apply where "a deponent's memory could credibly have been refreshed by subsequent events, including discussions with others or his review of documents, record, or papers." Id. at 1081. [Docket No. 208, 1-ER-017-018].

After recognizing the sham affidavit rule must be applied "with caution", the District Court erred in making made a credibility determination and ignored the testimony of Mr. Lee and his supporting documentation in finding Mr. Lee's declaration was sham affidavit. "The Court finds the sham affidavit rule applies

21

to the portions of the Lee Declaration in which he states he was able to work after November 18, 2019. The Lee Declaration "flatly contradicts" Lee's deposition regarding his ability to work. See Van Asdale v. Int'l Game Tech., 577 F.3d 989, 999 (9th Cir.2009). This contradiction is clear and unambiguous, and Lee has not offered any explanation for this contradiction. The only explanation Lee offers concerns why he put the date of disability as November 18, 2019 on his June 2020 Application. See Lee Decl. at ¶ 161 (explaining that because that was the last day he worked before being terminated and that was what he understood the question to mean at the time). Therefore, the Court finds the portions of the Lee Declaration in which he states he was able to work after November 18, 2019 to be a sham. This includes Lee's explanation for why he put the date of disability as November 18, 2019 on his June 2020 Application. These statements in his declaration cannot be used to create an issue of fact. See David v. Betts, CIV. NO. 20-00002 JMS-WRP, 2024 WL 2214613, at *17 n.24 (D. Hawai`i May 15, 2024) (striking a statement in a defendant's declaration, and pointing out the declarant "has not attempted to explain or resolve the clear contradiction"). Therefore, the Court will not consider those portions of the Lee Declaration for purposes of the instant Motion. [Docket No. 208, 1-ER-018-019].

   The District Court, in finding that Mr. Lee's declaration was a sham affidavit, ignores that: 1) On or about April 1, 2020, prior to his termination (June

22, 2020) and the date he became no longer able to work (June 23, 2020), Mr. Lee's doctor, Dr. Williamson, released him to return to work. [Docket No. 195-6, 2-ER-091 at ¶ 122]. 2) Mr. Lee has PTSD a disability that effects his ability to think clearly [Docket No. 195-6, 2-ER-097-098 at ¶ 149-150], 2) Mr. Lee explained that he made a mistake in his first SSA filing in believing November 18, 2019, the date he went out on stress leave, was the date he could no longer work (by his statement and a fair inference Mr. Lee has explained why his testimony and submission to the SSA was an error as a person with PTSD that effects his ability to think clearly and his short term memory.) [Docket No. 195-5, 2-ER-073-075] [Docket No. 195-6, 2-ER-097-100 at ¶ 149-166], 3) prior to his deposition or his declaration Mr. Lee submitted a second application with the SSA with the correct date that he could no longer work as of June 23, 2020. [Docket No. 195-6, 2-ER-099 at ¶ 165], 4) Several of the documents that were produced as a result of Defendant L3Harris's subpoena to the SS office reflect that Mr. Lee initially filed on June 25, 2020. [Docket No. 198-1, 2-ER-054]. [Docket No. 196-1, 2-ER-060]. [Docket No. 197-1, 2-ER-069].

Any assertion that Mr. Lee could not work after November 18, 2019 is clearly a disputed fact as Mr. Lee has submitted facts that he was ready and willing to return to work after November 18, 2019 and was cleared to do so by his doctor. . [Docket No. 195-6, 2-ER-091, 097-099 at ¶¶ 122, 148-165] and Exhibit C (Mr.

23

Lee's 2nd SSD application showing he was rendered completely disabled and unable to work as of June 23, 2020) [Docket No. 197-1, 2-ER-069]. Mr. Lee's first filing *pro se* with the SS Office erroneous informed them his disability began on the last day he actually worked for L3: November 18, 2019. This error was rectified in Mr. Lee's second SSD filing in which Mr. Lee submitted that his disability rendering him unable to work began on June 23, 2020. These facts clearly show that the November 18, 2019 date for Mr. Lee being unable to work was an error by an unsophisticated *pro se* filer who did not understand that the date he last worked was not the date his disability rendered him unable to work. [Docket No. 194, 2-ER-113]

 With all of this valid testimony and admissible documentation, Mr. Lee has shown that his declaration is not a sham affidavit as he explained any mistakes/inconsistencies. Via his declaration, exhibits and said explanation, Mr. Lee has created a genuine issue of material fact as to whether or not he was unable to work before June 22, 2020. Fairly judging the weight of the evidence taken in the light most favorable to Mr. Lee and including all reasonable inferences in his favor, Mr. Lee has submitted sufficient evidence for a reasonable juror to find he was able to work as of June 22, 2020, before he was terminated. If L3 now has fodder for cross-examination and possible impeachment that should be the extent

of the prejudice to Mr. Lee for being a person with a severe mental disability that effects his ability to think clearly and remember dates, etc.

## CONCLUSION

Considering the facts submitted by Mr. Lee a reasonable juror could find that Mr. Lee was able to work before he was terminated due to his disability. The District Court erred in granting summary judgment as the District Court ignored key facts and/or took the facts in the light most favorable to L3.

DATED: Honolulu, Hawaii, February 7, 2025.

/s/ Joseph T. Rosenbaum
JOSEPH T. ROSENBAUM
Attorney for Plaintiff-Appellant
Preston Lee

**STATEMENT OF RELATED CASES**

Plaintiff-Appellant Preston Lee is not aware of any other related cases with similar facts to this appeal.

DATED: Honolulu, Hawaii, February 7, 2025.

/s/ Joseph T. Rosenbaum
JOSEPH T. ROSENBAUM
Attorney for Plaintiff-Appellant
Preston Lee

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## 9ᵀᴴ Circuit Case No. 24–7295

---

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 7, 2025.

I hereby certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system as follows:

AMANDA M. JONES
*ajones@cades.com*
Attorney for Defendant/Appellee L3Harris Technologies, Inc.

DATED: Honolulu, Hawaii, February 7, 2025.

/s/ Joseph T. Rosenbaum
JOSEPH T. ROSENBAUM
Attorney for Plaintiff-Appellant
Preston Lee